## CIRCUIT COURT OF FAIRFAX COUNTY

Wayne C. Phipps,
Adm'r of the Estate of
Becky Lee Dwojeski-Phipps

v.

Martin R. West et al.

April 8, 1996

Case No. (Law) 138102

BY JUDGE ROBERT W. WOOLDRIDGE, JR.

This matter came before the Court for settlement of a wrongful death action against the liability defendants on January 17, 1996. The case arose out of the death of Becky Lee Dwojeski-Phipps as a result of an automobile accident on October 21, 1993. The case against the liability defendants was settled for $650,000.00 of which $420,464.43 is available for distribution to the statutory beneficiaries. The matter is now before the Court for allocation of the wrongful death proceeds.

Pursuant to § 8.01-53 of the Code of Virginia, there are three statutory beneficiaries of the wrongful death proceeds: Wayne C. Phipps, husband of the decedent (and administrator of her estate); Rosemary Goloway, the decedent's mother; and Leo Dwojeski, the decedent's father. The Court heard testimony on March 18-19, 1996, on the issue of the proper allocation of the wrongful death proceeds among the statutory beneficiaries. Following trial, proposed findings of fact and conclusions of law were filed on behalf of all beneficiaries.

Under § 8.01-52 of the Code of Virginia, damages for wrongful death:

> shall include, but may not be limited to, damages for the following:
> (1) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advise of the decedent;

(2) Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care, and assistance provided by the decedent;

(3) Expenses for the care, treatment, and hospitalization of the decedent incident to the injury resulting in death;

(4) Reasonable funeral expenses; and

(5) Punitive damages may be recovered for willful or wanton conduct or such recklessness as evinces a conscious disregard for the safety of others.

No evidence was presented and no claim was made by any of the statutory beneficiaries as to paragraphs 2, 3, 4, and 5 above.

Preliminarily, Mr. Dwojeski complains that he was not apprised of his status and rights as statutory beneficiary by the estate administrator, Mr. Phipps, or by counsel for the plaintiff in this proceeding in timely fashion. The evidence at trial was that although the accident occurred in October, 1993, and this action was filed in January, 1995, Mr. Dwojeski was not made aware of his statutory beneficiary status until early January, 1996, just weeks prior to trial. By the time of scheduled trial, he had retained his own counsel. Both Mr. Dwojeski and his counsel consented to the liability settlement (as did the other statutory beneficiaries) in January, 1996. The Court finds that this proceeding is not the forum for Mr. Dwojeski to pursue his dissatisfaction with Mr. Phipps as administrator of the estate or with plaintiff's counsel. If Mr. Dwojeski believes he has a cause of action against the administrator or plaintiff's counsel based on their actions or inactions, he should address those issues in a separate proceeding.

It was more than apparent to the Court that Ms. Dwojeski-Phipps was a loving and lovely daughter, wife, and person, and a successful career professional. Regretfully, her mother, father, and husband were unable to reach a resolution of this matter among themselves that would have done full justice to her memory and honor. Instead, lengthy evidence was presented about the breakup of her mother and father's marriage and her own marriage and about the lack of entitlement of some statutory beneficiaries relative to others. I do not suggest to the parties that after this wrongful death award, they patch up their differences. It is not my place to suggest that, and such an admonition would likely fall on deaf ears. But I do urge that they leave this litigation with fond memories of Becky, instead of with the discord that was aired in this proceeding.

Mrs. Goloway had a close relationship with her daughter for as long as her daughter was alive. That relationship matured as Ms. Dwojeski-Phipps

grew from childhood to adulthood. Mrs. Goloway and her daughter spoke, wrote, and met often. They were there for each other in difficult and happy times and through the everyday occurrences of life. Mrs. Goloway's grief and sorrow at the death of her daughter are beyond compare.

Mr. Phipps and Ms. Dwojeski-Phipps met in college and began dating in about 1980. They lived together for a number of years after college and married in 1987. Because they each made (sometimes reluctantly) career choices that were incompatible, they lived separately from one another beginning in 1990. In that separation they bought a house together in Virginia, talked by telephone many times a week, and continued to see each other on weekends and holidays. But by the summer of 1993, their relationship had changed such that a divorce was highly likely. In the late summer of 1993, Mr. Phipps had a brief relationship with another woman, unbeknownst to Ms. Dwojeski-Phipps. At the time of the decedent's death, no divorce suit had been filed but a proposed division of property had been exchanged. By all accounts, any divorce that would have taken place would have been extremely amicable with Mr. Phipps and Ms. Dwojeski-Phipps remaining what would be termed close friends under the circumstances.

Mr. Dwojeski and Mrs. Goloway divorced when their daughter was about seventeen years of age. Ms. Dwojeski-Phipps left the marital home along with her mother. From that time forward, Mr. Dwojeski had little contact with his daughter. He saw her on a few occasions while she was still in high school when he visited at his estranged wife's apartment. He was not invited to her high school graduation, although he did attend. Mr. Dwojeski provided little support to his daughter following the separation. He saw and talked to her only a handful of times while she was in college. He received an invitation to her college graduation addressed to "The Dwojeski Family." He was offended by the way the invitation was addressed and did not attend. He saw or spoke with her very infrequently after she finished college. He was not invited to her wedding. Ms. Dwojeski-Phipps told Mr. Phipps just before their wedding that inviting her father was "not even a consideration."

In the summer of 1993, Mrs. Goloway's mother died. Both Ms. Dwojeski-Phipps and Mr. Dwojeski attended the funeral service. They had not seen each other in ten years. They embraced and spoke briefly to each other at the service, with the prospect of a reapproachment at least being raised. Mr. Dwojeski intended to try to visit his daughter in the months that followed, but conflicting schedules and ultimately her untimely death

prevented that visit from taking place. His expectation after the funeral, in his own words, was that he and his daughter "would be together for the first time."

During the first half of her life, Mr. Dwojeski says he and his daughter had a close relationship and that she was his "pride and joy." Mrs. Goloway describes the father and daughter relationship then as cordial, social, and revolving around athletics. No doubt the divorce of her parents profoundly changed Ms. Dwojeski-Phipps' relationship with her father. Mrs. Goloway attributes that change in the relationship to the way Mr. Dwojeski treated her and treated his daughter throughout the marriage. Mr. Dwojeski claims Mrs. Goloway turned his daughter against him. It is certainly not unheard of for the child in a divorce to take the side of the parent with whom that child goes to live. As regrettable as that is, over time the relationship between the child and the non-custodial parent often returns when the breach is attributable solely to the parents' divorce. The Court is struck here by the fact that for the second half of her life, a level-headed and loving woman chose to keep her distance from her father. Regardless of the wisdom of her reasons for doing so, the distance between father and daughter speaks volumes in this case.

With the death of his daughter, Mr. Dwojeski likely felt guilty over the absence of a relationship with his daughter. But the nature of this grief and the extent to which he is entitled to compensation for it under the wrongful death statutes are certainly affected by the lack of a close relationship with his daughter.

One final matter bears mention. Mr. Phipps and Mrs. Goloway presented evidence and argument at length during the trial to disparage a memorial established by Mr. Dwojeski for his daughter. Within months of her death (and long before he knew of his status as statutory beneficiary), Mr. Dwojeski arranged with officials at Kenwood High School (which his daughter attended) to establish an athletic building and scholarship fund in her memory. It carried the name "Becky D." Mr. Phipps and Mrs. Goloway contend that Ms. Dwojeski-Phipps was a very quiet, private, and humble person and would not have wanted such public and personal recognition. They claim that Mr. Dwojeski established the fund for his own self-aggrandizement because of his long-standing interest in Kenwood High School athletics. The Court finds that the effort by Mr. Phipps and Mrs. Goloway to demean the memorial established in the decedent's name by her father is uncalled for and unwise. Just as we all make our separate peace with those whom we love who die, so will our methods of doing so

vary. Nothing about Mr. Dwojeski's method of honoring and remembering his daughter was inappropriate, nor should it offend the rest of Ms. Dwojeski-Phipps' family.

Based on all the evidence presented at trial, I award $250,000.00 of the wrongful death settlement proceeds to Mrs. Goloway, $145,000.00 to Mr. Phipps, and $25,464.43 to Mr. Dwojeski. All interest accruing on the wrongful death proceeds since their deposit with this Court shall be divided among the statutory beneficiaries in the same proportion as the above award. Plaintiff shall bear all costs of this proceeding.